FLORENCE M. SHOWALTER v. THE SOUTHERN KANSAS
RAILWAY COMPANY *et al.*

CITY — *Street, Vacated — Reversion — Abutting Owners.*   A street dedi-
cated by the filing of the plat of a congressional town-site on vacation
reverts to the abutting owners in proportion to frontage, according
to the law concerning cities of the second class, passed March 13,
1872, and ¶ 811, General Statutes 1889, and the second proviso con-
tained in ¶ 811 has no application to the facts in this case.

*Error from Sumner District Court.*

THE opinion states the material facts.

*McDonald & Parker,* and *Reed & Nebeker,* for plaintiff in
error:

How did First street revert when it was vacated, on April
20, 1887?   This question turns upon the construction of § 55
of the act concerning cities of the second class.   See Comp.

Laws of 1885, ¶ 858; Gen. Stat. of 1889, ¶ 811. That section, so far as it affects this case, is as follows: "The council shall have power to open, widen, extend or otherwise improve any street, avenue, alley, or lane, and also to vacate or discontinue the same whenever deemed necessary or expedient." Then follows a proviso. Then follows an exception to said last proviso, which is that "in cases where such street, avenue, alley or lane shall have been taken and appropriated to public use in a different proportion, in which case it shall revert to adjacent lots of real estate in proportion as it was taken from them." Then follows a further proviso, which relates only to alleys.

Plaintiff's contention is that First street reverted according to the general rule. Defendants contend that this case comes within the exception above stated.

The law concerning cities of the third class was passed March 8, 1871, and contained a provision that on vacation of any street the same should revert to the abutting owners according to frontage. No exception has ever been added. The act concerning cities of the second class was passed March 13, 1872, and provided for a reversion according to frontage until March 11, 1885, when the exception above referred to was added by amendment. It will then be seen that, at the time of the making of both plats, the law with reference to the reversion of vacated streets was in force both as to cities of the second and third classes. It was certainly competent for the legislature to provide as to the effect of a subsequent dedication of a street. Such a law enters into and is a part of the terms of the grant. No vested rights are interfered with nor violated. Such a law has been upheld. *Day v. Shroeder*, 46 Iowa, 546.

A different question arises, however, with reference to the exception which was engrafted on said statute in 1885, and on which defendants rely. We submit the question whether a right to a reversion accruing under and created by the law as it stood prior to 1885 can be altered, affected or taken away by such subsequent legislation. Up to said last date

the abutting owners had the right to the reversion to the center of the street, in the event of the vacation of the street. During 13 or 14 years that was the law, without any exceptions, as to cities of both the second and third classes.

Does this case fall within the exception? What was the purpose of this excepting clause? Why was it engrafted upon the law after the lapse of 13 years? This section as it stood and a similar section in the act concerning cities of the third class seem clear and unmistakable as to their terms. The common-law rule gave the reversion to the original owner. The right thereto remained in him and his heirs. The legislature abrogated that rule, and created a new rule for the disposition of public property upon its ceasing to be useful to the public. The right and claim of the original proprietor at common law was weak, and possessed little merit, if any. The old rule was abrogated, the old doctrine was repudiated. The new rule proceeds upon an idea more reasonable and equitable. It regards the original proprietor as having parted with all his title, and the land, when it becomes a superfluity, as capable of being donated and distributed. The street being vacated, the county and the public having no longer use for it, it was evidently considered by the legislature to be the proper thing for the title to pass from the county and the public, and go to such persons as had the most use for it and such as had the most meritorious claims upon it, such as in equity and good conscience it ought to be bestowed upon. The only persons thought of by the legislature were the abutting owners. It was then considered that all the abutting owners stood on an equal footing. It did not occur to the legislature till 13 years afterward that any case could arise where any other than an equal distribution ought to be made.

The exception which was grafted on in 1885 was an afterthought. The reason which called it into existence was an obvious one, but one easily overlooked. There is no attempt to depart from the policy originally adopted. The amendment must be construed as being in harmony with the spirit of the previous legislation, and as more completely carrying

out and perfecting the idea and policy thereof. Our theory is, that it was made for those instances where portions of lots or premises had been taken by compulsory proceedings for the purpose of opening, widening or extending a street. The language of the statute is the best guide. *Fitzpatrick v. Gebhard*, 7 Kas. 35. And this language, when analyzed, conclusively, as we think, proves our theory. Certain cases are excepted from the general rule of equal division. They are: "Where such street shall have been taken and appropriated to public use in a different proportion (not in proportion to the frontage)." The expression, "taken and appropriated to public use," is a familiar one. It occurs wherever the subject of eminent domain is discussed. Whenever it so occurs, it implies a compulsory taking by the exercise of that power. It means in that connection a compulsory taking as distinguished from a dedication or sale. It means without or regardless of the owner's consent. We claim that the whole section should be construed together, and its language and provisions made to harmonize. First street never was taken and appropriated. It was a street before there was any council, any city or any other power which could take and appropriate it. It became public property without any such proceeding. In fact, it never was private property. It was public lands always till it became a street, for it passed through the probate judge from the government to the public again. First street cannot revert to defendants' lots in the proportion that it was taken from them, because it never was taken from them in any proportion, nor to any extent. They have never been diminished nor encroached upon by First street. Their lines have remained intact during their entire existence, and during the life-time of the city.

It cannot be successfully argued that the legislature simply intended to modify the old rule so as to change the reversion from the original proprietor to his grantees. If that had been all that was intended to be accomplished, fewer words would have been required. The original proprietor and all the rights accruing to him under the old rule are ignored.

The statute is significantly silent about him. The new rule does not begin where the old rule left off, but it is a new departure, the old rule being entirely discarded.

We insist that the only true and reasonable construction of said section is, that upon the vacation of a street the same shall revert equally to abutting owners to the extent of their frontage, except that when the city government, in the exercise of the power given by said statute to open, widen or extend a street, have resorted to the means therein provided, and have taken portions or all of the lots of private individuals in unequal proportions, and after so doing such city government exercises the further power given by said statute, of vacating such street, then that such street reverts just as it had been so taken by such city. Therefore, that said First street reverted upon its vacation one-half to plaintiff, and not all to defendants; from which it follows, that the court below erred in all the rulings complained of by the plaintiff in error.

*Geo. R. Peck, A. A. Hurd, Robert Dunlap,* and *O. J. Wood,* for defendants in error:

As Myers did not own the land embraced within the street, and as he parted with nothing, and as the fee was vested in the county for the public, the legislature invaded no right of his, or his grantees, when it altered or amended the law, and provided for a different rule in which the property was to go when it ceased to be used for a public purpose. This is illustrated in the case of *Pennie v. Reis,* 132 U. S. 464. That case is, in all respects, analogous to the case at bar. See, also, *Union Parish Society v. Upton,* 74 Me. 545; Myer, Vested Rights, p. 27, note 87.

If the land in the street attaches to the adjacent lot in the nature of an accretion, this is by virtue of a rule of law enacted by the legislature. Until the accretion actually does attach, the plaintiff has no vested right in this rule of law. See *Munn v. Illinois,* 94 U. S. 113. It therefore follows that the amendment of 1885 is not unconstitutional, but is valid;

and we turn therefore to the question as to what is the proper meaning of the language used in the amendment or the exception. It is claimed that the language, "where such a street shall have been taken and appropriated to public use in a different proportion, it shall revert to the adjacent lots of real estate in proportion as it was taken from them," was intended to provide only for cases in which the land was taken for a street *in invitum*, compensation being made to the owner; that the words "taken and appropriated to public use" can only be construed as taken under the power of eminent domain, because these words are used in the constitution of this state. The only provision in the constitution, however, with reference to the exercise of the power of eminent domain is found in § 4, article 12, of the constitution, which provides that " no right-of-way shall be appropriated to the use of any corporation until full compensation therefor be first made in money to the owner," etc.; but the context in which the word "appropriated" is used in that section shows that it refers to an appropriation *in invitum* by the public, compensation to be made to the owner; and generally, where the words "taken and appropriated" are used in the statute providing for the exercise of the power of eminent domain, the words are used in conjunction with other words showing that in those cases it is taken against the will of the owner, upon compensation being made. But the meaning of these words is to be determined by the context. In *Cushman v. Smith*, 34 Me. 259, in commenting upon the word "taken," the following language is used:

"That word is used in a variety of senses and to communicate ideas quite different. Its sense as used in a particular case is to be ascertained by the connection in which it is used, and from the context, the whole being applied to the state of facts respecting which it is used."

In *Jerome v. Ross*, 7 Johns. Ch. 343, the words "taken and appropriated" are held to mean, "permanently applied, so as to be entirely lost to the owner, and not to lands affording a temporary use for passage," etc. And so, where it says in

the amendment of 1885 that where such streets shall have been taken and appropriated to public use in a different proportion, it does not necessarily mean taken by the public against the will of the owner on making compensation to him. A street may be taken by the public as a gift or donation by the owner. It may be appropriated to a public use where it is permanently set apart from the other land for the use of the public. The street, or the land occupied by the street, was taken from a larger body of land and appropriated to public use, either by the public in accepting the gift or by the owner in making the gift. In the amendment of 1885 it speaks of the street as being taken in a different proportion, not from the owner, but the land; because it goes on to say that it shall revert, not to the owners, but to the adjacent lots of land in proportion as it was taken from "them"—not the owners, but the lots of land. So that it cannot be said that the context in which these words "taken and appropriated" are used in the amendment of 1885 means only taken and appropriated by the public for the public use, against the will of the owner and upon making compensation to him. In order to give it that construction, it is necessary to inject into the section these additional words.

A great deal is said about the equity of the law in making the land go in proportion to the frontage, but there is certainly more equity in directing that the land shall go back to the one who donated it or to his grantees, when it ceases to be used for a public purpose.

But again, if plaintiff's contention were true, that the exception was only intended to apply to the lands taken in the exercise of the power of eminent domain, then this exception and this amendment were wholly unnecessary. An examination of the legislation in reference to cities of the first, second and third classes will show that, where the street is opened and the land taken under the power of eminent domain, the fee does not vest in the city, nor in the county, nor in the public. No words are used in any of the provisions vesting the fee in the city or in the county, and therefore nothing

is acquired by the public except an easement. Lewis, Em. Dom., §§ 278, 596 ; *Gebhart v. Reeves,* 75 Ill. 304.

There is no reversion, because the fee was not parted with, it always remaining in the original proprietor or his subsequent grantee. Therefore, the adjacent lot-owner would enjoy as much of the property in the street after its vacation ·as his grantor or he himself had before condemnation. The exception made in the law of 1885 was intended to take out the case from that which was contained in what immediately preceded it, and would certainly have to be limited to cases which had been previously provided for. The proviso, therefore, with reference to the reversion of the land in the street to the owners of the adjacent real estate in proportion to the frontage, could only provide for those cases in which the fee had been vested in the public, because, if an easement merely were taken under the law, the fee remained in the original owner or in his subsequent grantee. This was proper, and the legislature would not have the power to take that property from those to whom it belonged, and provide that it should go to somebody else. Lewis, Em. Dom., § 596 ; *Calder v. Bull,* 3 Dall. 386, 388; *Gebhardt v. Reeves,* 75 Ill. 304.

It is manifest that the legislature did not intend to do this. From the foregoing it must follow, that the exception contained in the amendment of 1885 was intended to apply to cases in which land had been dedicated by the owner for the use of the public and to cases in which the fee had vested in the public, because it will not be presumed that the legislature intended to cover a case already provided for, or make a provision similar to one in force. This would be wholly useless.

As the plaintiff did not under the law show that she was the owner of this strip of land formerly embraced within First street, but as the admitted facts show she had no title, she was therefore not entitled to recover damages as for a permanent appropriation of the land by the railroad company, and the judgment of the district court in favor of the defendants was therefore correct, and should be affirmed.

Opinion by SIMPSON, C.: At the time this action was commenced, the plaintiff in error, Florence M. Showalter, was the owner of the west half of block No. 2, in Myers's addition to the city of Wellington, being a piece of ground 305 feet long from north to south, and 150 feet wide from east to west. At the time of the trial the plaintiff in error, with her husband, had resided on the half block for over 12 years. Their dwelling-house fronted on and was located about 45 feet from First street, that ran east and west along the northern boundary of the half block. First street was a part of the original town-site of Wellington, entered on behalf of the occupants by the probate judge of Sumner county. A plat was made by the probate judge laying the town-site off into blocks, lots, streets, and alleys, and the same was filed for record on the 13th day of July, 1872. First street separated the town-site from the land of E. K. Myers that was located immediately south and adjoining that part of the town-site. On the 28th day of October, 1872, Myers filed a plat of an addition to Wellington abutting on First street. The west half of block No. 2, in such addition, was purchased from Myers by Mrs. Showalter, who erected a dweling-house and other improvements. The defendant in error railway company owned lots Nos. 8, 9, 10, 11, 12, 13, 14, 15, and 16, in block 95, in the city of Wellington. These lots are located immediately north of the west half of block 2 in Myers's addition, the same being separated by First street. On the 19th day of May, 1887, the following city ordinance was passed and approved, and was duly published:

"AN ORDINANCE discontinuing and vacating First street between A street and F street, in the city of Wellington, Kas., for the purpose of granting the right-of-way to the Southern Kansas Railway Company and the Wichita & Southwestern Railway Company for the construction, operation and maintenance of lines of railroads, sidetracks, switches, second tracks, depots, freight houses and other buildings, water stations, water aqueducts or mains, material for construction and proper drains.

"*Be it ordained by the mayor and councilmen of the City of Wellington, Kas.:*

"488. Southern Kansas and Wichita & Southwestern. (1)

That the right-of-way be and the same is hereby granted
jointly and severally to the Southern Kansas Railway Com-
pany and the Wichita & Southwestern Railway Company,
their successors and assigns, to construct, forever maintain
and operate lines of railroad, side-tracks, switches and sec-
ond tracks, depots, freight houses and other buildings, water
stations, water aqueducts or mains, material for construction
and proper drains upon, along, over and across First street,
or any part thereof, between A street and F street, in the
original town (now city) of Wellington, in Sumner county,
Kansas.

"489. Authorized to build embankments, etc. (2) That
in the construction of said lines of railroad, side-tracks,
switches and second tracks, depots, freight houses and other
buildings, water stations, water aqueducts or mains, and proper
drains upon, along, over, through and across said street, as
provided in section 1, said railway companies or either of
them, their successors or assigns, are hereby authorized and em-
powered to build such embankments and make such excava-
tions as may be necessary and proper: *Provided, always,* That
whenever said railway companies, or either of them, shall con-
struct any track or tracks, switch or switches, so as to cross
or intersect any of the avenues, streets or alleys of said city
that are now, or may be hereafter, used as public highways,
said railway companies shall, when requested by the city coun-
cil of said city, immediately construct and maintain, so long
as said highway shall remain, suitable, safe and convenient ap-
proaches and crossings of its said track or tracks, switch or
switches, for public use and travel through and upon such
avenues, streets, and alleys.

"490. Vacation of streets; commissioners. (3) That all
that part of First street between A street and F street be and
the same is hereby vacated and discontinued; that W. R.
Spicknall, Geo. H. Hunter, D. A. Espy, F. B. West, A. Bran-
aman, five disinterested householders of the city of Welling-
ton, be and the same are hereby appointed commissioners and
viewers to ascertain and report damages sustained by citizens
of said city of Wellington and owners of property therein,
by reason of the discontinuance of that portion of said First
street aforesaid, as provided in this section.

"491. Duty of commissioners. (4) Said commissioners
and viewers shall meet on the 21st day of April, 1887, at 10
o'clock A. M., at the intersection of Washington avenue with

said First street, in said city, and, after having taken an oath as provided by law, shall proceed to faithfully and impartially make the assessment to them submitted, and report their action in writing to the mayor and councilmen.

"492. Report to be filed. (5) Upon the finding of said report by said commissioners and viewers, and after the same has been examined and confirmed by the mayor and council, said city shall pay to the persons respectively entitled thereto, as shown by the report of said commissioners, the amount of damage awarded by such commissioners, and warrants shall be drawn as in other cases upon the city treasurer of the city for such respective sums.

"493. Railroads authorized to enter upon said street. (6) Upon the filing of said report, said railroad companies, their successors or assigns, or either of them, shall be entitled to enter upon said street vacated as aforesaid, and proceed to the construction of such railroad, side-tracks, switches, second tracks, depots, freight-houses, water stations, water aqueducts or mains, and proper drains, as may be necessary for their use and operation.

"494. Compensation of commissioners. (7) Said commissioners shall receive for their services the sum of $2 per day.

"495. In effect. (8) This ordinance shall take effect and be in force from and after its publication in the daily *Postal Card*, the official newspaper."

At the trial it was admitted that the railroad company entered upon First street immediately north of the half block of the plaintiff in error, and laid its tracks along said streets and over the strip of land 20 feet wide, described in the plaintiff's petition. First street was 40 feet wide at the place vacated. This action is to recover damages for the permanent use and occupancy of one-half of the land formerly known as First street, abutting the lots of the plaintiff in error on the north; the theory of the plaintiff in error being that, at the time of the vacation of that portion of First street abutting these lots, the street reverted to the abutting owners in proportion to frontage, according to the law concerning cities of the third class, passed March 8, 1871, and the act concerning cities of the second class, passed March 13, 1872, and ¶ 811, General Statutes of 1889. The railroad company claims

under an exception in the second proviso contained in ¶ 811, that reads: "Except in cases where such street, avenue, alley or lane shall have been taken and appropriated to public use in a different proportion, in which case it shall revert to adjacent lots of real estate, in proportion as it was taken from them." It is said on behalf of the railroad company, that as the street was originally dedicated from the land belonging to the occupants of the town-site of Wellington, and never was a part of Myers's addition, it reverted in proportion as it was taken from the town-site. All being taken from the town-site, it all reverted to the lots platted from the town-site that abutted. We cannot agree to this construction. It seems to us that the proviso is intended to apply to cases where the city council, by the power granted it in this section in widening a street or alley, takes land from adjacent town lots, it shall revert to *them*, meaning the lots it was taken from, in proportion as it was taken. The city council can lay out a new street or alley. It can widen streets or alleys already laid out. In doing this it might become necessary to take a greater part of the width of a new street, or an old one that it seeks to widen, from a tier of lots on one side than on the other, and it is such cases as this that this proviso is intended to meet.

The general rule that prevails in all statutes on this subject is, that when a street or alley is vacated, the land reverts to the abutting owners in proportion to frontage. This legislation or some other statutory regulation became necessary, because our statutes vest the fee to a street or alley in the county. The fee is so vested on account of the public use, and being vested in the public, the legislature has the power to dispose of the fee when the street or alley is vacated. At common law it would revert to the owner who made the dedication, and the use was merely an easement. The general rule established by the legislature must prevail in this case unless it clearly appears that this street comes within the exception. The view we take is strengthened by the language of the provision, that seems to require that a street or alley,

to fall within its operation, must have been taken and appropriated to public use. These words convey to the mind the idea that the street or alley must have been the product of the exercise of the right of eminent domain, rather than the ordinary act of dedication of streets and alleys by the original town-site proprietors. They have acquired a peculiar and technical meaning by their occurrence in the constitution and statutes of the state. First street was a dedication made by a congressional town-site company, and was not a creation of the right of eminent domain. It was a part and parcel of a congressional town-site, and was not taken and appropriated for public use from town lots in different proportions. The same instrument that established the blocks and lots, with their locations, sizes and numbers, also fixed the length, breadth and location of the street. The lots were designated and numbered with reference to the street, and no part of the street was ever taken from the adjacent lots. Both the identity of the street and the lots abutting on it were established at the same moment by the filing of the town plat. Hence, we cannot conclude that the proviso applies, but the conviction grows stronger with examination that the general rule adopted by all the various statutes applies, and that one-half in width of the street abutting on the lots of the plaintiff in error reverted to these adjacent lots when the street was vacated.

We recommend that the judgment be reversed, and the cause remanded; with instructions to grant a new trial.

By the Court: It is so ordered.

VALENTINE and JOHNSTON, JJ., concurring.

HORTON, C. J., dissenting, upon the law as applied to the facts.